IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 3, 2021 Session

## DOUG ZUKOWSKI EX REL. TAYLOR ALEXANDER ZUKOWSKI v. HAMILTON COUNTY DEPARTMENT OF EDUCATION

**Appeal from the Circuit Court for Hamilton County**
**No. 14C684      Ward Jeffrey Hollingsworth, Judge**

---

**No. E2020-00939-COA-R3-CV**

---

This appeal arises from a school bullying lawsuit. Doug Zukowski and Aimee Zukowski filed suit in the Circuit Court for Hamilton County ("the Trial Court") on behalf of their son Taylor Alexander Zukowski ("Alex," who later joined the suit in his own right after turning 18) ("Plaintiffs," collectively) against the Hamilton County Department of Education ("Defendant"). Plaintiffs alleged that Alex was bullied while a student at Chattanooga's Center for Creative Arts ("CCA"), a public fine arts magnet school, and that Defendant breached its duty of care to protect Alex. Plaintiffs appeal, raising a number of issues. We find that the record does not contain the requisite clear and convincing evidence necessary to overturn the Trial Court's credibility determinations. We also find, *inter alia*, that the evidence does not preponderate against the Trial Court's factual finding that Defendant's employees responded appropriately when Alex reported to them that he was bullied. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Phillip E. Fleenor and M.E. Buck Dougherty, III, Chattanooga, Tennessee, for the appellants, Aimee Zukowski, Doug Zukowski, and Taylor Alexander Zukowski.

D. Scott Bennett and Mary C. DeCamp, Chattanooga, Tennessee, for the appellee, the Hamilton County Department of Education.

# OPINION

## Background

In June 2014, Plaintiffs Doug and Aimee Zukowski, as guardians and friends of their then-minor son Alex, filed a lawsuit under the Governmental Tort Liability Act ("the GTLA") against Defendant in the Trial Court. Plaintiffs alleged that Alex was bullied and sexually harassed while attending CCA, a school run by Defendant. Plaintiffs alleged further that Defendant was aware of the bullying and failed to stop it. In August 2014, Defendant filed an answer in opposition. After a number of procedural delays and a change of counsel, Plaintiffs filed a motion in April 2019 to amend their complaint. Among other things, Plaintiffs wished to add a Title IX claim. In May 2019, the Trial Court entered an order granting in part and denying in part Plaintiffs' motion to amend. In its order, the Trial Court granted Plaintiffs' request to add Alex (by then of majority age) as a plaintiff. The Trial Court also granted Plaintiffs' request to add language 'fleshing out' their allegations of bullying. However, the Trial Court denied Plaintiffs' request to name specific students and teachers in the complaint, partially on grounds of undue delay but also on grounds of undue prejudice to the individuals and futility. As pertinent to an issue raised on appeal, the Trial Court denied Plaintiffs' request to add a Title IX claim, stating:

> The same argument concerning undue delay can be made. The facts of this case have been known since at least 2014. They have not changed. Title IX was in existence and could have been pled at the time.
> The greater problem, however, is the undue prejudice to the defendant if this amendment was allowed. In Hardcastle, at p. 81, the court set forth the six (6) factors to be considered. The most important factor is the amendment's potential prejudicial effect on the party opposing the amendment.
> Certain factors are to be considered by a court deciding this issue. Those factors are:
>
> > "(1) the hardship on the moving party if the amendment is denied; (2) the reasons for the moving party's failure to include the claim, defense, or other matter in its earlier pleadings; (3) the injustice to the opposing party should the motion to amend be granted." Hardcastle, at p. 81.
>
> The hardship on the plaintiffs is that they will not be able to assert a claim that could, if proven, result in a larger monetary award. However, that consideration is outweighed by the fact that no reason has been given for the failure to assert the Title IX claim earlier and the injustice to the defendant

-2-

to have to gear up to defend an entirely different claim than the one it has been facing for the past 4 ½ years.

Finally, the Hardcastle court noted that "Late amendments fundamentally changing the theory of a case are generally not viewed favorably when the facts and theory have been known to the party seeking the amendment since the beginning of the litigation." Hardcastle at p. 81. The court in that case goes on to state that such amendments are usually denied when the opposing party is legitimately surprised or when the amendment "…will (a) cause additional expense and the burden of a more complicated and lengthy trial, (2) require the opposing party to engage in significantly additional pretrial preparation, (3) unduly increase discovery or (4) unduly delay trial."

All four of those factors are met in this case. With the inclusion of the Title IX claim, this goes from a bench trial of possibly a few days to a jury trial of much greater length. The defendant loses the protection of the damage caps afforded by the GTLA and is exposed to the possibility of a much higher monetary verdict. The issues are different, so significant additional discovery will be required….

In May 2019, Plaintiffs filed a motion to continue trial. In June 2019, the Trial Court entered an order denying Plaintiffs' motion to continue. The Trial Court stated, in relevant part: "[T]he Court noted that it had already granted a continuance to Plaintiffs in January 2019. The Court further found that the length of time that this matter has been pending and the need to avoid additional delay in reaching the resolution of this matter were sufficient reasons to warrant denial of this Motion." In July 2019, Plaintiffs filed their second amended complaint.

Trial took place on multiple days from July 9 through July 12, 2019 and then resumed from February 11, 2020 through February 14, 2020. Numerous witnesses testified, including school officials, teachers, and Alex himself. Alex testified to enduring bullying during his seventh and eighth grade years at CCA. Alex testified that a group of girls calling themselves "the Ghetto Girls" tormented him through physical intimidation and the use of terms like "gay." Alex stated that he repeatedly brought this bullying to the attention of school officials but they never took any effective action to stop it. Alex, who had thrived in the sixth grade at CCA, began to fare poorly in school as the bullying persisted. Alex later left CCA and was placed on the homebound program.

On cross-examination, Alex was asked whether he had ever submitted any written complaints about his bullying. Alex stated that he had not, but that he had never been told to do so. Alex testified:

Q. You never submitted any written complaints or notes to anyone about anything that you say was happening to you, did you?

A. Are we -- are we talking about at all like in general at CCA or --

Q. Right.

A. Let's see. I was -- I was never approached by any teachers or any administrators or any counselors to write down my accounts of anything that happened to me except for the [C.G.] incident. I was to write down my accounts of that.

Q. Right. For something that happened to [C.G.]?

A. Correct.

Q. Yeah. So --

A. I was a witness to it.

Q. Right. But you never elected to write anything down, did you?

A. I was never told by an administrator to take a statement for anything that happened to me.

Q. That wasn't my question.

A. Well, that's -- go ahead. Rephrase your question.

THE COURT: Just answer the question, then you can explain it.

Q. My question was you never elected to write anything down and submit it to anyone, did you?

THE COURT: Just answer yes or no and then explain your answer.

A. Okay. Gotcha. No, I never elected to write anything down and that was simply because I was never told to write anything down about what happened.

The record does, however, contain an instance of a contemporaneous report of Alex being bullied. An October 24, 2012 email sent by Alex's homeroom teacher, Stacia Bearden ("Ms. Bearden"), was entered as an exhibit at trial. Ms. Bearden sent this email to her colleagues, including Principal Deborah Smith ("Principal Smith"). Ms. Bearden's email reads as follows:

I got a report today from an 8th grader about a bully in 7th who is making life miserable for another one of our 7th grade students. Once again we have someone bullying Alex Zukowski. He is afraid of her because she is much larger than he is and is afraid to report it out of fear that she will retaliate, but my 8th grader was very upset over it and was crying in my class today over the extreme bullying by this girl towards one of her classmates.

[B.W.] is calling him gay, using homosexual slurs, making fun of him, trying to touch him when he has told her not to touch him, and is also telling him "don't worry I will protect you" in gym when they play capture the flag to

-4-

insinuate that he is less of a man and can't take care of himself because [of] her assumptions over his sexuality. This is not the first time Alex has been bullied at this school, and I personally have noticed [B.W.] being inappropriate with others in the hall last year even when she was in 6th grade and spoke to her about respecting the personal space of others. I have also noticed Alex being more withdrawn, participating less in class, and having a sad demeanor in class and in the hallway. He is suffering!

This needs to stop IMMEDIATELY. Alex is a precious child that I adore, so I am very angry over this and feel someone else needs to handle this situation as soon as possible. I have no idea about his sexuality, nor do I even care; however, this child does NOT need to feel unsafe at CCA. It is damaging him both emotionally and academically, so I feel strongly it needs to be stopped at all costs.

I am copying his other teachers on this email to make them aware of the situation so they can make efforts to keep an eye out for him in their classes.

Principal Smith testified at trial. Asked about her response to Ms. Bearden's email, Principal Smith stated:

Q. So, Ms. Smith, as you testified earlier, you did call BW into your office?
A. Yes, I did.
Q. Did you do that pretty quickly after you got this e-mail?
A. Yes. I spoke to her about the e-mail.
Q. Did you do it pretty quickly after you got the e-mail?
A. Oh, yes. Yes. When I get something like that, those kinds of things move to the head of the class. I mean, they move right up there. You don't sit on things like that. That would not be appropriate.

***

Q. So, Ms. Smith, the subject line of this e-mail is seventh grade bully. After your investigation and your conversation with BW and your conversation with her mother, did you determine that what BW had been doing amounted to bullying?
A. No, I did not.
Q. Why is that?
A. I did not because the way this e-mail is worded and BW's explanation for it, had it not been outlined PE, Capture the Flag, those kinds of things. Even

-5-

during any kind of games with kids, they will turn and say don't touch me or I don't want you on my team or whatever….

Q. Ms. Smith, you didn't determine it to be bullying. What did you determine it to be?

A. I determined it to be inappropriate behavior, unkindness, an opportunity for me to say to her and remind her this is not what we do at CCA. I said, more than that, you shouldn't do this anywhere. The kids refer to it as calling me out of my name. That was permeated in my mind.

***

Q. After you addressed what Ms. Bearden alleged in her e-mail, did you ever receive any other report of alleged bullying of Alex during his seventh grade year?

A. No, ma'am, I did not.

Principal Smith testified to another incident involving Alex whereby in October 2013 he came to her office in a nervous state:

A. … So he was standing between the chairs. I could tell. I mean, he was just like -- I said, Alex you're not in any trouble, you're not in any trouble. I just need you to tell me about what happened at lunch. He said he needed to call his mom, so he reached in his pocket and got his phone out to call his mom. He said, I can't get her. She's not answering. I said okay. Then he said, I need to call Mr. Ray. I said, well, he's in class but go ahead.

Q. Ms. Smith, you testified earlier that ultimately you did not get a statement from Alex?

A. I did not because he was nervous. I offered him a seat, and he said no, that's okay. I said, Alex, I really wanted to get a statement from you. Again, I could tell he was nervous. I said, look, let's not worry about that. We'll get that tomorrow, whenever. We'll get it another time. You may go back to class.

Q. Did you ever get a statement from him?

A. No.

Q. A written or any statement?

A. No.

Q. Why is that?

A. He didn't come back. He didn't come back to school.

Q. After this day?

A. Yes.

Q. At any point, Ms. Smith, when Alex was in here talking to you and you were talking to him on that day in your office, did he tell you that he had seen ZP and she had made a throat slash symbol at him?
A. No. He would not have seen her.
Q. Is that something you would remember today?
A. Absolutely I'd remember that.
Q. And why is that?
A. Because that is very inappropriate, extremely inappropriate. If a student would have done that, I would have had her right back in there. She was in the conference room.

Two policies were entered into the record as exhibits—Hamilton County Board of Education Policy 5.500 and Policy 6.304. Policy 5.500 forbids harassment of students and employees and sets out a procedure for investigating complaints of harassment. Under Policy 5.500, the descriptor term for which was "Harassment/Sexual Harassment and Discrimination," complaints are to be investigated out of Defendant's central office ("This investigation shall be conducted by school system officials or by a third party designated by the board of education"). Policy 6.304, the descriptor term for which was "Student Discrimination/Harassment and Bullying/Intimidation," similarly bars harassing conduct but differs from Policy 5.500 in that it omits the central office component to the investigation of claims. Policy 6.304 states, in part:

Students shall be provided a safe learning environment. It shall be a violation of this policy for any student to bully, intimidate or create a hostile educational environment for another student…. Bullying and intimidation are defined as either physically harming a student or damaging his/her property, or knowingly placing the student in reasonable fear of such, or creating a hostile educational environment … Alleged victims of the above-referenced offenses shall report these incidents immediately to a teacher, counselor or building administrator. Any allegations shall be fully investigated by a complaint manager….

(Footnote omitted). Defendant contends that Policy 5.500 is for sexual harassment claims regarding school personnel and is unfeasible for dealing with allegations of student bullying.

Another major point of contention at trial was whether Jerry Griswold ("Mr. Griswold"), Alex's math teacher, refused to let Alex change seats in class to move away from his bully. Alex contended that Mr. Griswold would not let him change seats. Mr. Griswold was retired from teaching by the time of trial. Mr. Griswold had been in a car accident that left him with some degree of memory impairment, and Mr. Griswold did not

remember Alex. Asked if he would have allowed a student to switch seats to get away from a bully, Mr. Griswold testified:

Q. If a student asked you if they could change seats, what would your response be?
A. Normally, yes. I asked for a reason why.
Q. If a student came up and asked you if they could change seats, would you ever tell that student that you don't move seats?
A. No. I never did move kids.
Q. Why is that? Why would you say no, I don't move seats?
A. I don't know. That's a good question. I just never did. That's why it's not -- why did I never not is a double negative.
Q. That was a bad question. That's not your fault. That's my fault.
A. I move seats every year. When I first started teaching I would move kids. Sometimes I'd let them come on and choose their own seats. If it worked, I'd let them keep them for a while.
Q. Mr. Griswold, if a student came to you and asked to change seats, and the reason they gave you was because a seat mate of theirs physically hovered over them and shoved them, would you let that student change seats?
A. Absolutely.

In June 2020, the Trial Court entered its detailed Memorandum Opinion and Order ruling in favor of Defendant. The Trial Court found, among others things, that Defendant's employees acted appropriately in response to incidents of bullying reported to them by Alex. The Trial Court found that Alex was not a credible witness. In its detailed order, the Trial Court stated, in relevant part:

In this case, the testimony of Alex Zukowski was not accurate or credible enough to carry the burden of proof. There were many contradictions and inaccuracies in his testimony about what happened, whether he informed school officials of what happened and the actions taken by the school officials when they were notified of the incident.

**ALLEGATIONS OF BULLYING AT CCA**

Alex Zukowski entered CCA as a 6th grader in the fall of 2011. His 5th grade year at an elementary school on Signal Mountain had been difficult. Before his 5th grade year, Alex was the victim of a cruel prank by some of his classmates. As a result, the uncontradicted testimony was that he was subjected to bullying by classmates throughout the school year. When the 5th grade was over and the time came to move on to Middle School, Alex was

ready for a change. His acceptance at CCA provided the opportunity to start anew.

Alex's 6th grade year at CC[A] was excellent from any perspective. He was happy at CCA, was able to engage in theatrical activities he loved and excelled academically and socially. He received accolades and awards. None of the faculty or staff at CCA were aware of the incident that occurred on Signal Mountain before his 5th grade year. There was no need to tell anyone. Alex appeared to be putting all of that behind him.

At the beginning of his 7th grade year in the fall of 2012, Alex was chosen as a tour guide for the school's "Overture" program. Overture is an orientation for incoming students at CCA. Each tour guide is assigned to a group of new students to show them around the campus and describe what to expect when school started.

One of the new students in Alex's group was the sister of one of the boys who had pulled the cruel prank on Alex before his 5th grade year on Signal Mountain. The sister had apparently heard about the incident and, according to Alex, mentioned it during the Overture program and apparently referred to him as "gay" or "faggot." That evening, Alex told his mother what happened. His mother contacted Ms. Smith, CCA's principal. Ms. Zukowski also explained to Ms. Smith what had occurred before Alex's 5th grade year.

Ms. Smith, the principal, testified at trial. She stated that when she heard of the Overture incident from Ms. Zukowski, she prepared to speak to the incoming student and her parents about the incident Alex reported. She stated she was prepared to inform the incoming student of the school's policies on bullying and that her behavior toward Alex, if it occurred, would not be tolerated. The next morning, the prospective new student and her mother appeared at CCA. When Ms. Smith went out to speak with them, the mother told her that the prospective new student did not want to attend CCA and was withdrawing her application. Ms. Smith, considering the circumstances, did not bring up the Overture incident with Alex. She accepted the student's withdrawal. It was brought out at trial that Ms. Smith did not speak to Alex about the incident. She testified that, with the new student withdrawing, she saw no need to have Alex relive something that was so upsetting to him. This was a judgment call by Ms. Smith. While some may disagree with her decision, it is not anything that would impose liability. Also, there was testimony that the school counselor informed Alex that the student involved in the incident would not attend CCA.

Based upon the testimony described above, the court finds no evidence of negligence or breach of duty by Ms. Smith or other staff and faculty of CCA in relation to the Overture incident.

## BULLYING IN 7TH GRADE

After the Overture incident, school started. At trial, Alex testified that he started experiencing trouble with some female students in his classes. According to Alex, the female students referred to themselves as the "Ghetto Girls." One of the female students was [B.W.]. Alex testified that [B.W.] would "hover" over him in Mr. Griswold's math class and copy his homework…[Alex] did not remember [B.W.] as a fellow student before 7th grade. However, on cross-examination, it was shown that he had several classes with [B.W.]….[Alex] said his complaints were ignored. He testified that he begged Mr. Griswold to move him in class, so that he would not be seated next to [B.W.]. He stated that Mr. Griswold refused to do so.

Mr. Griswold testified at trial. At time of trial, he was retired from a teaching career of 41 years. Mr. Griswold was Alex's 7th grade math teacher in the 2012-2013 school year. He testified that he was involved in a head on collision in the spring of 2013 and missed the end of that school year. He admitted to suffering "some memory loss." However, he was able to return to teaching and did so until his retirement in 2018. Mr. Griswold's testimony about the way he ran his class was clear and consistent. He agreed that students were seated in groups and that it was entirely possible that Alex and [B.W.] were in the same group. However, he also testified that he rarely refused a student's request to move if the student was uncomfortable in the group to which he was assigned. He also testified that he would not ignore a complaint from a student about bullying or harassment. He described the process he would follow in handling such a complaint. This testimony, which the court found to be credible, refutes the testimony offered by Alex.

\*\*\*

There was another incident in which [B.W.] called Alex "gay." A complaint was made and action was taken. Ms. Smith, the principal, called [B.W.] to the office and discussed with her that such conduct was inappropriate and would not be tolerated at CCA…. Ms. Smith did not consider this to be bullying because it was only one incident. However, action was taken.

[B.W.] and her mother testified at trial. [B.W.] is a student at MTSU and was straightforward in her testimony. She admitted to the incident described above, but denied the other allegations made by Alex. Her mother verified Ms. Smith's testimony about the incident.

\*\*\*

Alex testified that during his 7th grade year, he complained constantly to Ms. Milen, the school counselor. When Ms. Milen testified, she said she did not remember meeting with Alex. She stated that, if she was meeting with a student on a constant basis, she would keep a file and would, in all likelihood remember some of the meetings. There was controversy over the fact that Ms. Milen destroyed student files when she left CCA. The reasoning was that those files were confidential and should not be left for others to see. Again, one could question the wisdom of the practice. However, testimony was presented by the defendant that the destruction of the files was in accordance with Department of Education regulations in effect at the time. Ms. Milen's testimony contradicts the testimony of Alex.

Ray Laliberte was a teacher at CCA and a friend of the Zukowski family. Prior to Alex's 8th grade year, Alex told Mr. Laliberte about the problems he was having. Mr. Laliberte gave Alex notes allowing Alex to come see him if anything occurred. However, Mr. Laliberte stated that during Alex's 7th grade year, when most of the bullying allegedly took place, Alex never came to him to report anything.

During his 7th grade year, Alex did not tell his father about the bullying and terror he said he was facing.

Dr. Kimberly Brown testified for the Plaintiffs. Her expert opinion was that Alex had suffered depression, anxiety and possibly post traumatic stress disorder ("PTSD") as a result of his experiences at CCA. While the Court is not dismissing Dr. Brown's testimony, it must be noted that her opinions are, for the most part, based on the history of events given by Alex. As noted, there are discrepancies in Alex's testimony of what happened. It has been proven that Alex suffers from or has suffered from emotional or psychological problems. However, the inaccuracies of Alex's testimony as to what occurred at CCA do not lead to the conclusion that those problems were caused by his experiences at CCA. There were other stressful events occurring in Alex's life concerning his parents' marriage and his relationship with his mother.

Also, Dr. Brown's diagnosis does not affect the proof on the issue of whether the faculty and staff at CCA failed to act on complaints of bullying made by Alex or his parents.

As noted previously, Ms. Smith dealt with the Overture incident and the incident involving [B.W.].

In Alex's 8th grade year, there was an incident involving one of the female students Alex claimed to be bullying him and a friend of Alex's named [C.]. The allegation was that the female student had pushed [C.] down and hit or kicked him. Alex witnessed the incident and reported it. Mr.

-11-

Maynard, the Assistant Principal, investigated the incident and disciplinary action was taken. Alex was commended for coming forward.

When Alex's father complained about the actions of one of Alex's teachers, Mr. Maynard arranged a meeting with Alex and the teacher and then had Alex transferred to another class.

The evidence produced in this case leads this Court to find that when complaints were made to faculty or staff, action was taken. The faculty and staff at CCA did its duty.

As to other incidents related by Alex, there is not sufficient evidence to conclude that those incidents were reported to school officials. They could not take action on incidents of which they were not aware.

At the time of trial, Alex was a student at the University of Tennessee and appeared to be doing well. It is the hope of this Court that he continue on that positive path.

However, it is the finding of this Court that:

1. it has not been proven that all of the incidents of bullying or harassment alleged by the Plaintiffs actually occurred, and

2. the incidents that did occur and were reported to the faculty and/or staff were addressed appropriately.

The verdict is that the Plaintiffs have failed to prove by a preponderance of the evidence that the employees of the Hamilton County Department of Education were negligent or failed in their duty to protect Alex Zukowski while he was a student at CCA.

Plaintiffs timely appealed to this Court.

## Discussion

Although not stated exactly as such, Plaintiffs raise the following issues on appeal: 1) whether the evidence preponderates against the Trial Court's finding that Alex was not bullied; 2) whether the evidence preponderates against the Trial Court's finding that Defendant's employees responded appropriately to allegations that Alex was bullied; 3) whether the Trial Court abused its discretion in considering testimonial evidence from witnesses in violation of Tenn. R. Evid. 615; 4) whether the Trial Court abused its discretion in denying Plaintiffs' motion for a continuance of trial; 5) whether the Trial Court abused its discretion in failing to find Plaintiffs were entitled to favorable inferences due to Defendant's destruction of Alex's school counseling records during the pendency of the matter; and, 6) whether the Trial Court abused its discretion in denying Plaintiffs' Rule 15 motion to amend their complaint to assert a cause of action under Title IX.

-12-

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Regarding witness credibility, our Supreme Court has stated:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ––– U.S. ––––, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014). Some of the issues on appeal implicate the abuse of discretion standard. "An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011).

We first address whether the evidence preponderates against the Trial Court's finding that Alex was not bullied. In support of their argument, Plaintiffs assert (1) that Defendant placed Alex on homebound precisely because of his being bullied as evidenced by the diagnosis of his pediatrician Dr. Elaine Hatch; (2) the expert testimony of Dr. Kimberly Brown was that Alex was a victim of bullying; (3) the October 24, 2012 email sent by Ms. Bearden reflected that Alex was a victim of bullying; (4) that Mr. Griswold had memory impairment; and, (5) that Mr. Laliberte gave Alex two handwritten notes to come see him if he were bullied.

We disagree with Plaintiffs' premise. The Trial Court did not categorically find that Alex was not a victim of bullying. Such a finding, had it been made, would be against the weight of the evidence. Instead, the Trial Court found that not all of the instances of bullying alleged by Plaintiffs had been proven which means that some were proven. While the Trial Court's finding on this point may not be a model of clarity, we do not interpret it as finding that Alex was not bullied at all while attending CCA. Based upon this rather large record and extensive testimony as well as documentary evidence, it is clear to us that Alex was, in fact, bullied while a student at CCA. However, that does not end our inquiry just as it did not end the Trial Court's inquiry.

We next address whether the evidence preponderates against the Trial Court's finding that Defendant's employees responded appropriately to incidents of bullying that did occur and were reported to Defendant's employees. This question implicates the actions and inactions of Defendant's personnel. With respect to negligence claims in a school setting, this Court has stated:

> In a cause of action for negligence, a plaintiff must establish five elements: a duty of care owed by the defendant to the plaintiff, breach by the defendant of that duty of care, injury or loss, cause in fact, and proximate or legal cause. *Hale v. Ostrow*, 166 S.W.3d 713, 716 (Tenn. 2005); *Waste Mgmt., Inc. v. S. Cent. Bell Tel. Co.*, 15 S.W.3d 425, 430 (Tenn. Ct. App. 1997). Schools districts "are not expected to be insurers of the safety of students while they are at school." *Roberts v. Robertson Cnty. Bd. of Educ.*, 692 S.W.2d 863, 870 (Tenn. Ct. App. 1985). School districts do, however, have a duty to safeguard students while at school from "reasonably foreseeable dangerous conditions including the dangerous acts of fellow students." *Id*. at 872. The question of whether there has been a breach of the duty of care is an issue for the trier of fact. *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 552 (Tenn. 2005). Foreseeability, an essential component of proximate (or legal) cause, is an issue of fact, and the trial court's findings regarding foreseeability are, therefore, entitled to a presumption of correctness. *Cox v. State*, 844 S.W.2d 173, 178 (Tenn. Ct. App. 1992).

*Phillips ex rel. Gentry v. Robertson Cnty. Bd. of Educ.*, No. M2012-00401-COA-R3-CV, 2012 WL 3984637, at *4 (Tenn. Ct. App. Sept. 11, 2012), *no appl. perm. appeal filed.*

Relative to this issue, Plaintiffs assert as follows: (1) that Defendant owed Alex a duty of care under the GTLA to provide him with a safe learning environment and to investigate any claims of bullying; (2) that Defendant breached its duty of care to Alex; (3) that Alex developed post-traumatic stress disorder as a result of Defendant's breach of duty; and, (4) that Alex's PTSD was reasonably foreseeable by Defendant. Plaintiffs assert

-14-

the following as specific examples of bullying: (1) the bullying observed in Ms. Bearden's email to faculty colleagues about Alex being bullied in the 7th grade; (2) Defendant's homebound forms and Dr. Hatch's diagnosis of Alex as a victim of bullying; (3) Alex being bullied in Mr. Griswold's class; (4) Alex being bullied in Mr. Picone's English class; and, (5) other instances of bullying testified to by Alex's friend, Emma. Plaintiffs argue: "The failure by HCDE principal Ms. Smith and other CCA employees to conduct proper and required investigations pursuant to controlling HCDE policies, regarding the various and on-going bullying incidents Alex experienced, in which they all had actual knowledge, fell below the applicable standard of care of school employees and administrators."

While the applicable standard of care required Defendant to provide Alex with an educational environment safe from bullying or harassment, that extends only to reasonably foreseeable dangerous conditions as schools are not and cannot be absolute insurers of student safety. The Trial Court made detailed findings as to the response by Defendant's employees when they were told about incidents of bullying, including: Principal Smith's discussion of CCA's bullying policies with the person who bullied Alex during the Overture program; Principal Smith's discussion with B.W. regarding how the latter's bullying of Alex would not be tolerated at CCA; and Mr. Laliberte's testimony that he gave Alex notes allowing him to come see him if he encountered any more bullying. While Plaintiffs insist that a 'proper investigation' was required, Defendant's responses constituted reasonable and proportional measures to known problems.

Alex's contention that his requests for help were ignored implicates witness credibility. We extend strong deference to a trial court's credibility determinations and overturn these determinations only upon a finding of clear and convincing evidence. The threshold of clear and convincing evidence is high. Clear and convincing evidence eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. That high threshold has not been met here. The Trial Court had the benefit of seeing and hearing the witnesses testify; we do not have that same perspective. The Trial Court found Alex's testimony not to be credible while finding Defendant's witnesses to be credible.

The evidence in the record on appeal shows that Alex was bullied, under any accepted definition of that term, while a student at CCA. The record further reflects that Alex suffered academically and emotionally during this time. However, for purposes of establishing Defendant's liability under the GTLA, Plaintiffs were obliged to prove that Defendant breached its duty of care owed to Alex. In view of the Trial Court's credibility determinations, the evidence does not preponderate against the Trial Court's finding that, when Defendant's employees learned that Alex was bullied, they took appropriate steps to halt the bullying. We affirm the Trial Court on this issue.

We next address whether the Trial Court abused its discretion in considering testimonial evidence from witnesses in violation of Tenn. R. Evid. 615. Rule 615 of the Tennessee Rules of Evidence states: "At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing…." Our Supreme Court has explained: "The purpose of the rule [of sequestration] is to prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." *State v. Harris*, 839 S.W.2d 54, 68 (Tenn. 1992). Rule 615 does not set out precisely what is to happen upon a violation of the rule. "When a sequestration rule violation is raised on appeal, the court shall consider the seriousness of the violation and the prejudice, if any, suffered by the defendant." *State v. Reid*, No. M2001-02753-CCA-R3-DD, 2003 WL 23021393, at *45 (Tenn. Crim. App. Dec. 29, 2003), *aff'd by State v. Reid*, 164 S.W.3d 286 (Tenn. 2005). Trial courts have considerable discretion in determining how to respond to violations of Rule 615. *In re Brayden S.*, No. M2014-02241-COA-R3-PT, 2015 WL 5320272, at *4 (Tenn. Ct. App. Sept. 11, 2015), *no appl. perm. appeal filed*.

In their principal brief, Plaintiffs assert these instances of Rule 615's violation: (1) the testimony of Ms. Stalans, an employee of Defendant's, that she found Alex's friend Emma untruthful concerning a conversation Emma testified to in the first phase of trial, and (2) a reference by Assistant Principal Maynard to "prep" with counsel for Defendant. With respect to Ms. Stalans, the trial transcript shows that the Trial Court struck the offending testimony in response to an objection by Plaintiffs. Furthermore, there is no hint that Ms. Stalans' testimony had a decisive effect on the outcome of this case. With respect to Assistant Principal Maynard's testimony, Plaintiffs state:

> Mr. Maynard[] also testified about conversations with Attorney DeCamp during the interim between trial dates: "I did not remember the conversation [with Ms. Carmichael] until last October [of 2019]. That's when I was asking about it." Again, Ms. Carmichael, a witness of the Appellants, testified during the first half of trial in July, and Mr. Maynard should not have been informed about this in-court testimony of Ms. Carmichael in October 2019 while the rule was invoked.

(Record citations omitted). We find Assistant Principal Maynard's mention of trial preparation too fleeting to warrant reversal of the Trial Court's judgment as Plaintiffs request. It is evident from the Trial Court's order that it based its decision on the wide range of evidence before it and its assessment of the respective witnesses' credibility. We find no hint that the Trial Court relied on evidence in violation of Rule 615 in arriving at the outcome it did. We find no reversible error as to this issue.

-16-

We next address whether the Trial Court abused its discretion in denying Plaintiffs' May 2019 motion for a continuance of trial. Regarding the factors that courts consider in ruling on motions to continue, we have stated:

> "Decisions regarding continuances are fact-specific" and "motions for a continuance should be viewed in the context of all the circumstances existing when the motion is filed." *Nagarajan v. Terry*, 151 S.W.3d 166, 172 (Tenn. Ct. App. 2003). This Court has held that the party seeking a continuance carries the burden to prove the circumstances that justify the continuance. *Osagie v. Peakload Temporary Services*, 91 S.W.3d 326, 329 (Tenn. Ct. App. 2002). In order to meet this burden, the moving party must supply some "strong excuse" for postponing the trial date. *Barber & McMurry, Inc. v. Top-Flite Development Corp. Inc.*, 720 S.W.2d 469, 471 (Tenn. Ct. App. 1986) (citing *Levitt & Co. v. Kriger*, 6 Tenn.App. 323 (Tenn. Ct. App. 1927)). Factors relevant to the trial court's decision include: "(1) the length of time the proceeding has been pending, (2) the reason for the continuance, (3) the diligence of the party seeking the continuance, and (4) the prejudice to the requesting party if the continuance is not granted." *Nagarajan*, 151 S.W.3d at 172.

*Howell v. Ryerkerk*, 372 S.W.3d 576, 580-81 (Tenn. Ct. App. 2012) (footnote omitted).

Plaintiffs assert that the Trial Court erred by considering only the length of time the matter had been pending and no other factors, such as the fact Plaintiffs had recently retained new counsel. We disagree that was the only factor considered by the Trial Court. While the law provides several relevant factors for consideration as set out above, the weight afforded to each factor depends on the particular circumstances. First, it was Plaintiffs' new counsel who agreed to reset the case in July 2019. When Plaintiffs filed their motion to continue in May 2019, the matter had been pending for five years. The Trial Court noted further that it already had granted Plaintiffs a continuance in January 2019. These were thoroughly reasonable bases upon which the Trial Court made its discretionary decision. We discern no abuse of discretion in the Trial Court's denial of Plaintiffs' motion to continue.

Continuing our review of Plaintiffs' issues, we next address whether the Trial Court abused its discretion in failing to find Plaintiffs were entitled to favorable inferences due to Defendant's destruction of Alex's school counseling records during the pendency of the matter. Our Supreme Court has discussed the potential sanctions attendant to spoliation of evidence as follows:

The decision to impose sanctions for the spoliation of evidence is within the wide discretion of the trial court. *See Mercer*, 134 S.W.3d at 133; *Gross*, 2007 WL 3171155, at *7 (citing *Thurman-Bryant*, 1991 WL 222256, at *5). The determination of whether a sanction should be imposed for the spoliation of evidence necessarily depends upon the unique circumstances of each case. Factors which are relevant to a trial court's consideration of what, if any, sanction should be imposed for the spoliation of evidence include:

(1) the culpability of the spoliating party in causing the destruction of the evidence, including evidence of intentional misconduct or fraudulent intent;
(2) the degree of prejudice suffered by the non-spoliating party as a result of the absence of the evidence;
(3) whether, at the time the evidence was destroyed, the spoliating party knew or should have known that the evidence was relevant to pending or reasonably foreseeable litigation; and
(4) the least severe sanction available to remedy any prejudice caused to the non-spoliating party.

A trial court's discretionary decision to impose a particular sanction "will be set aside on appeal only when 'the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of evidence.' " *Mercer*, 134 S.W.3d at 133 (quoting *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)). With regard to the specific sanction of dismissal of an action, although we recognize that the dismissal of an action is a severe sanction, we hold that "such a sanction would be appropriate in circumstances where any less severe remedy would not be sufficient to redress the prejudice caused" to the non-spoliating party by the loss of the evidence. *Cincinnati Ins. Co.*, 2008 WL 220287, at *4.

*Tatham v. Bridgestone Ams. Holding, Inc.*, 473 S.W.3d 734, 746-47 (Tenn. 2015) (footnote omitted).

Plaintiffs assert that "[Defendant] recklessly allowed the destruction of critical counseling records to cover-up numerous instances of Alex being bullied as early as his 7th grade year at CCA." Kristen Milen ("Ms. Milen"), former school counselor at CCA, destroyed all of her student files when she left CCA. Ms. Milen asserted that she did so on grounds of confidentiality. Patricia Russell ("Ms. Russell"), Defendant's Director of Social and Emotional Learning, oversees Defendant's counselors. Ms. Russell testified that this practice was "suitable." Ms. Russell testified:

Q. So if a guidance counselor is at a school and then leaves a school, is no longer going to be at the school, should they leave their records there at the school?

A. No, because then those records will be unprotected. It's almost as if you would leave a file on an office counter for anyone to have access to. We don't do that.

Q. So if a guidance counselor leaves a school, what should they do with those records?

A. They should make sure these important records are shredded. We don't just simply throw them in the trash can. We assure they are shredded to once again make sure we are protecting families and students.

In their reply brief, Plaintiff state: "The only reasonable inference is that HCDE made Alex's counseling records disappear to cover-up the bullying Alex endured while a student at CCA, which may be gleaned from HCDE's spoliation." We, as did the Trial Court, disagree with Plaintiffs that there is only one reasonable inference to be drawn. The testimony reflects that Ms. Milen's destruction of her student files upon leaving CCA was a legitimate and regular practice grounded in concern for confidentiality. In addition, to the extent Plaintiffs contend that Ms. Milen's records would have revealed that Alex was bullied at CCA, the fact of Alex having been bullied is well-established elsewhere in the record. We discern no reversible error in the Trial Court's refusal to apply negative inferences or other sanctions on the basis of the destruction of counselor records.

The final issue we address is whether the Trial Court abused its discretion in denying Plaintiffs' Rule 15 motion to amend their complaint to assert a cause of action under Title IX. With regard to the factors guiding courts' consideration of whether to grant a motion to amend under Tenn. R. Civ. P. 15, this Court has stated:

[A] trial court's decision on a motion to amend a pleading is reviewed under an abuse of discretion standard. *Fann v. City of Fairview*, 905 S.W.2d 167, 175 (Tenn. Ct. App. 1994). Rule 15.01 of the Tennessee Rules of Civil Procedure provides that leave of court to amend pleadings "shall be freely given when justice so requires." The Tennessee Supreme Court has recognized that the language of Rule 15.01 "substantially lessens the exercise of pre-trial discretion on the part of a trial judge." *Branch v. Warren*, 527 S.W.2d 89, 91 (Tenn. 1975); *see also Hardcastle v. Harris*, 170 S.W.3d 67, 80-81 (Tenn. Ct. App. 2004). In considering a motion to amend, a trial court is to consider several factors, including: "undue delay in filing the amendment, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue

-19-

prejudice to the opposing party, and the futility of the amendment." *Gardiner v. Word*, 731 S.W.2d 889, 891-92 (Tenn. 1987).

*Blackwell v. Sky High Sports Nashville Operations, LLC*, 523 S.W.3d 624, 656 (Tenn. Ct. App. 2017).

Plaintiffs present the following arguments on this issue: (1) that Alex should have been allowed to assert a Title IX claim as he had reached majority age and just then joined the lawsuit in his own right; (2) that the Trial Court allowed Plaintiffs to "flesh out" allegations of sexual harassment, so Plaintiffs should have been allowed to further "flesh out" their complaint by adding a Title IX claim; and (3) that Alex was deprived of a chance to vindicate his civil rights under federal law after reaching majority age when the evidence at trial supported a Title IX claim against Defendant, and Alex's constitutional rights to trial by jury under the Tennessee Constitution also were violated.

Plaintiffs are correct in that motions to amend generally are treated with liberality. However, courts may consider certain factors such as undue delay and prejudice to the opposing party in declining to grant a motion to amend. Here, the Trial Court set out its reasoning for denying Plaintiffs' request to add a Title IX claim. The Trial Court noted that the facts of the case had been known for five years. Doug Zukowski and Aimee Zukowski filed this suit on Alex's behalf and did not have to wait until Alex reached majority age to seek to amend to add a Title IX claim. A Title IX claim also would have necessitated a jury trial, thus prolonging the matter further and possibly requiring additional discovery. In essence, the Trial Court found that Plaintiffs waited too long to introduce their new claim. We find no abuse of discretion in the Trial Court's decision. With respect to Plaintiffs' contention that Alex has a constitutional right to trial by jury, that of course depends on the type of claim being brought—the very subject in dispute in this issue. Respectfully, Plaintiffs do not have an absolute right to amend their complaint to add a claim altering the timing and nature of trial and the exposure to the opposing party after waiting five years without good reason shown for the delay. We affirm the judgment of the Trial Court in its entirety.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellants Aimee Zukowski, Doug Zukowski, and Taylor Alexander Zukowski, and their surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE